# UNITED STATES DISTRICT COURT
for the
District of New Jersey

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Randy Poulson | ) | Case No. |
| | ) | 14-1052 (AMD) |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **February 22, 2011** in the county of **Gloucester** in the **_____** District of **New Jersey**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | On or about February 22, 2011, in the District of New Jersey, and elsewhere, the defendant, RANDY POULSON, for the purpose of executing and attempting to execute a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did knowingly and intentionally cause to be delivered by mail according to the directions thereon two checks issued by Equity Trust Comapany each in the amount of $14,999 addressed to Randy Poulson in Woolwich Township, New Jersey from Elyria, Ohio. |

This criminal complaint is based on these facts:

See Attachment.

☑ Continued on the attached sheet.

_____
Complainant's signature

Nicole M. Canales, Special Agent, FBI
_____
Printed name and title

Sworn to before me and signed in my presence.

Date: 05/13/2014

_____
Judge's signature

City and state: Camden, New Jersey

Hon. Ann Marie Donio
_____
Printed name and title

**CONTENTS APPROVED**

UNITED STATES ATTORNEY

By: _____
  R. STEPHEN STIGALL, AUSA

Date: _____5/13/14_____

13

## ATTACHMENT A

On or about February 22, 2011, in Gloucester County, the District of New Jersey, and elsewhere, the defendant,

RANDY POULSON,

for the purpose of executing and attempting to execute a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly and intentionally cause to be delivered by mail according to the direction thereon two checks issued by Equity Trust Company each in the amount of $14,999 addressed to Randy Poulson in Woolwich Township, New Jersey from Elyria, Ohio.

In violation of Title 18, United States Code, Section 1341.

## ATTACHMENT B

I, Nicole M. Canales, ("the affiant"), state that I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein based upon my own investigation, a review of documents obtained during the investigation, interviews of witnesses and victims, and learning information provided to me by other law enforcement officers. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint, I have not necessarily included each and every fact known by the government concerning this investigation.

1.  I have been employed with the FBI as a Special Agent since 2009, assigned to the Philadelphia Division, South Jersey Resident Agency. During that time, I have investigated cases involving allegations of mail fraud and wire fraud, bank fraud, and money laundering, and have been the "lead" or case agent on numerous investigations. During the course of my investigations, I have utilized informants and cooperating witnesses (including the use of consensual monitoring techniques); conducted surveillance; analyzed financial records, telephone toll records, and pen register records; and conducted interviews. In addition, while employed with the FBI, I have received specialized training in economic crimes and have received formal investigative training at the FBI's training academy in Quantico, Virginia.

2.  In August of 2011, I commenced an investigation into defendant RANDY POULSON. The investigation revealed that POULSON engaged in a two-pronged scheme and artifice to defraud. In one prong of the scheme, POULSON caused distressed homeowners facing foreclosure to "sell" their residences to POULSON for POULSON's return promise to pay the homeowners' mortgages. In doing so, POUSLON obtained the deeds to more than 25 distressed homeowners' residences, and caused the distressed homeowners to move out of their

residences. POULSON stopped making the monthly mortgage payments on the distressed homeowners' mortgages, causing those mortgages to go into foreclosure without the distressed homeowners' knowledge. In the second prong of the scheme, POULSON successfully solicited more than 50 private investors to invest money into POULSON's companies which purportedly bought and sold real estate. POULSON explained to the investors that their investment would be used to acquire and rehabilitate a property, which POULSON would rent and then allegedly repay the private money investor the amount invested plus approximately 10 - 20 % interest. The properties for which POULSON solicited the private money investments were the properties he acquired as part of the first prong of the scheme. Although POULSON claimed that he would use the private investment money to acquire and rehabilitate real estate properties, in reality POULSON spent the private money investments on personal expenses and repaid, in part, other prior investors. POULSON did not repay a majority of the private money investors, realizing the more than $3 million he took in as part of the scheme.

3. During the course of the investigation, I interviewed Victims "A" and "C," and reviewed various documents, all of which provide an example of the above-referenced two-pronged scheme.

4. Victim A informed law enforcement officers, in substance and in part, of the following: Victims A and B, a married couple, owned a home in Sewell, New Jersey (the "Sewell Property") on which they had a mortgage but were behind in making the monthly mortgage payments. Victim B saw a sign that stated "We Buy Houses" with a telephone number on it. Victim A called the number listed on the sign and spoke with defendant RANDY POULSON who claimed that he was purchasing properties, renting them out, and reselling the properties. POULSON asked to purchase the Sewell Property and Victim A agreed. Prior to the

3

sale, Victim A and B's family moved out of the home. At settlement on the sale of the home, POULSON assured Victim A that after the sale, Victims A and B would not be liable for anything associated with the Sewell Property. A few times right after the sale, Victim A received several calls from the institution which held the mortgage on the Sewell Property that the mortgage payments were a month behind.

5. A review of records associated with the sale of the Sewell Property to defendant RANDY POULSON show that the deed on the property was transferred to POULSON. Records also show that the mortgage was in arrears and that the institution initiated foreclosure proceedings on the property against Victim A because POULSON did not make monthly mortgage payments.

6. Victim C informed law enforcement officers, in substance and in part, as follows: in 2011 Victims C and D, a married couple, each invested $14,999 with defendant RANDY POULSON for a purported 3-year term earning 15% compounded interest. POULSON claimed that the investment money would be used for the Sewell Property. Victims C and D did not give POULSON permission to spend their investment money on personal expenses or to repay other investors.

7. A review of records associated with Victim C and D's private investment shows that defendant RANDY POULSON purportedly issued promissory notes and gave each a mortgage on the Sewell Property, promising to repay the $14,999 investment plus 15% interest. POULSON, however, did not inform Victims C or D that he also purportedly gave a mortgage on the Sewell Property to at least five other individuals.

8. In addition, records from Equity Trust Company ("Equity Trust") reveal that Victims C and D used money they had in retirement accounts at Equity Trust to invest with

4

defendant RANDY POULSON. Those records also show that on February 22, 2011, POULSON emailed Equity Trust and forwarded documents to accompany Victim C and D's "Direction of Investment" forms which authorized Equity Trust to issue checks from Victim C and D's retirement accounts to POULSON.

9. Equity Trust records also show that the company sent two checks from Victim C and D's retirement accounts via UPS from Elyria, Ohio on February 22, 2011 to defendant RANDY POULSON in Woolwich Township, New Jersey.

10. A review of TD Bank records for an account in the name of Equity Capital Investments, LLC ("Equity Capital Investments") ending in 4258 – which was opened and maintained by defendant RANDY POULSON – show that the two checks from Victim C and D's retirement accounts issued in the name of POULSON were deposited into POULSON's Equity Capital Investments bank account on February 23, 2011. Those records also show that after the deposit, POULSON spent the money on, among other things, Ray's Pizza, Acme, Exxon/Mobil, Jos. A. Bank, and Wawa.

11. What happened with Victims A and C is but one example of defendant RANDY POULSON's scheme and artifice, and followed a pattern, which can be summarized as follows: Based on numerous interviews of victims, POULSON, in both oral presentations and in written materials, told investors that their money would be used to fund the purchase, maintenance, and improvement of a specific residential property, including the closing costs of acquiring the property, a down payment, rehabilitation costs, and mortgage payments prior to finding a renter. POULSON claimed that he was operating through his business, Equity Capital Investments. In terms of oral presentations, numerous witnesses have informed law enforcement officers, in substance and in part, that POULSON gave three weekend-long seminars, numerous speeches at

monthly dinners, and various, private tutorial sessions, purporting to teach real estate investing tips to individuals who paid fees to attend. All of these educational speeches and seminars were hosted by one of POULSON's purported companies, Poulson RUSSO, LLC. POULSON used these seminars to solicit investors for his fraudulent scheme with Equity Capital Investments, LLC.

12. In order to give the impression that Equity Capital Investments was a legitimate business, defendant RANDY POULSON provided investors with false and fraudulent mortgages and promissory notes for residential properties he was purportedly purchasing, renting, and reselling for a profit to his business.

13. In most instances, defendant RANDY POULSON provided investors with promissory notes reflecting the amount of their investment in Equity Capital Investments and a term with a specified interest rate. The term of the investment varied; some were as short as 90 days, some were 6 months, and others were one, two, or three years. Interest rates likewise varied between 10%, 15, % or 20%.

14. Based on these promised returns and representations regarding the use of their investments, the investors provided defendant RANDY POULSON money, both by wire transfer and by check sent through the mail, which was deposited into Equity Capital Investments' bank account at TD Bank.

15. Many of the victim-investors have informed law enforcement officers, in substance and in part, that they did not give defendant RANDY POULSON permission to use their private money investment to pay POULSON's personal or business expenses, or repay other investors.

16. A review of defendant RANDY POULSON's personal and business bank records reveal that POULSON spent the investors' money on personal expenses and repaid, in part, prior investors.[1] For example, at various times during the scheme, POUSLON misappropriated hundreds of thousands of dollars to pay for personal expenses, such as DirecTV, Ray's Pizza, Hollywood Grooming, Kiddie Garden, Philadelphia Union tickets, American Express, Studio 122 (a hair salon), The Disney Store, Toys 'R Us, and rent-to-own payments on a personal beach house located in Ventnor, New Jersey. Bank records show that many of these personal expenditures were made shortly after defendant RANDY POULSON and Equity Capital Investments received investment money from a victim.

17. Based on interviews of victims and a review of various documents, including bank records, the majority of the investors were not repaid, the majority of the mortgages were not recorded, and many investors received mortgages which were given to multiple investors.

18. Witness interviews have also revealed that in addition to soliciting investors at paid "educational" seminars hosted by Poulson RUSSO, LLC, as described above, defendant RANDY POULSON also solicited investors associated with the South Jersey Investor's Club ("SJIC"). POULSON is the former president of the SJIC, which, according to its Web site, offers opportunities for individuals interested in learning more about real estate investing to attend events to hear purported "successful, local real estate investors" share secrets to financial success.[2]

19. In addition to Victims A, B, C, and D, the FBI has interviewed approximately 75 victims of defendant RANDY POULSON'S scheme identified to date.

---

[1] Bank records and witness statements also reveal that defendant RANDY POULSON and Equity Capital Investments had virtually no income-generating operations at all; rather, the vast majority of the money that came into Equity Capital Investments was through the solicitation of investor money.
[2] See http://sjreia.org.

7

20. The table below displays some of the victims identified in the investigation, how much each victim invested with defendant RANDY POULSON and his company, Equity Capital Investments, how much money each victim was repaid (if any), and each victim's net loss:

| Investor Victim # | State | Invested | Repaid | Net |
|---|---|---|---|---|
| 1 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 2 | New Jersey | $5,000.00 | $1,500.00 | -$3,500.00 |
| 3 | New Jersey | $20,000.00 | $0.00 | -$20,000.00 |
| 4 | New Jersey | $40,000.00 | $0.00 | -$40,000.00 |
| 5 | New Jersey | $25,000.00 | $22,561.64 | -$2,438.36 |
| 6 | New Jersey | $25,000.00 | $0.00 | -$25,000.00 |
| 7 | New Jersey | $40,000.00 | $0.00 | -$40,000.00 |
| 8 | New Jersey | $60,000.00 | $17,000.00 | -$43,000.00 |
| 9 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 10 | New Jersey | $45,000.00 | $0.00 | -$45,000.00 |
| 11 | New Jersey | $115,000.00 | $0.00 | -$115,000.00 |
| 12 | New Jersey | $0.00 | $0.00 | $0.00 |
| 13 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 14 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 15 | New Jersey | $40,000.00 | $31,025.00 | -$8,975.00 |
| 16 | Pennsylvania | $50,000.00 | $26,625.00 | -$23,375.00 |
| 17 | New Jersey | $100,000.00 | $0.00 | -$100,000.00 |
| 18 | New Jersey | $60,000.00 | $0.00 | -$60,000.00 |
| 19 | Pennsylvania | $40,000.00 | $15,000.00 | -$25,000.00 |
| 20 | New York | $50,000.00 | $0.00 | -$50,000.00 |
| 21 | Unknown | $183,000.00 | $14,125.00 | -$168,875.00 |
| 22 | New Jersey | $15,000.00 | $0.00 | -$15,000.00 |
| 23 | New Jersey | $40,000.00 | $0.00 | -$40,000.00 |
| 24 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 25 | New Jersey | $198,000.00 | $57,760.00 | -$140,240.00 |
| 26 | New Jersey | $130,000.00 | $87,750.00 | -$42,250.00 |
| 27 | New Jersey | $12,000.00 | $0.00 | -$12,000.00 |
| 28 | New Jersey | $29,998.00 | $0.00 | -$29,998.00 |
| 29 | New Jersey | $20,000.00 | $0.00 | -$20,000.00 |
| 30 | New Jersey | $24,000.00 | $0.00 | -$24,000.00 |
| 31 | New Jersey | $19,000.00 | $0.00 | -$19,000.00 |
| 32 | New Jersey | $30,000.00 | $0.00 | -$30,000.00 |
| 33 | New Jersey | $140,000.00 | $42,500.00 | -$97,500.00 |
| 34 | New Jersey | $92,000.00 | $21,339.00 | -$70,611.00 |

| | | | | | |
|---|---|---|---|---|---|
| 35 | New Jersey | | $72,000.00 | $30,372.14 | -$41,627.86 |
| 36 | New Jersey | | $80,000.00 | $20,000.00 | -$60,000.00 |
| 37 | New Jersey | | $34,500.00 | $15,750.00 | -$18,750.00 |
| 38 | New Jersey | | $430,000.00 | $0.00 | -$430,000.00 |
| 39 | Pennsylvania | | $20,000.00 | $10,500.00 | -$9,500.00 |
| 40 | Pennsylvania | | $35,000.00 | $0.00 | -$35,000.00 |
| 41 | New Jersey | | $18,200.00 | $0.00 | -$18,200.00 |
| 42 | New Jersey | | $10,000.00 | $0.00 | -$10,000.00 |
| 43 | New Jersey | | $13,000.00 | $0.00 | -$13,000.00 |
| 44 | New Jersey | | $12,000.00 | $0.00 | -$12,000.00 |
| 45 | New Jersey | | $10,000.00 | $0.00 | -$10,000.00 |
| 46 | New Jersey | | $7,000.00 | $0.00 | -$7,000.00 |
| 48 | New Jersey | | $365,000.00 | $397,815.74 | $32,815.74 |
| 49 | New Jersey | | $30,000.00 | $33,000.00 | $3,000.00 |
| 50 | Unknown | | $12,000.00 | $15,870.00 | $3,870.00 |
| 51 | Unknown | | $25,000.00 | $0.00 | -$25,000.00 |
| 52 | Unknown | | $5,000.00 | $0.00 | -$5,000.00 |
| 53 | New Jersey | | $5,000.00 | $0.00 | -$5,000.00 |
| 54 | Unknown | | $100,000.00 | $110,000.00 | $10,000.00 |
| 55 | Unknown | | $63,000.00 | $82,168.00 | $19,168.00 |
| 56 | New Jersey | | $15,000.00 | $18,000.00 | $3,000.00 |
| 57 | New York | | $10,000.00 | $12,000.00 | $2,000.00 |
| 58 | Unknown | | $25,000.00 | $0.00 | -$25,000.00 |
| 59 | New York | | $7,000.00 | $7,703.00 | $703.00 |
| 60 | New Jersey | | $40,000.00 | $40,000.00 | $0.00 |
| 61 | Pennsylvania | | $65,000.00 | $0.00 | -$65,000.00 |
| 62 | New Jersey | | $70,000.00 | $70,500.00 | $500.00 |
| 63 | New Jersey | | $40,000.00 | $43,000.00 | $3,000.00 |
| 64 | New Jersey | | $50,000.00 | $57,500.00 | $7,500.00 |
| 65 | Unknown | | $13,500.00 | $0.00 | -$13,500.00 |
| 66 | Pennsylvania | | $30,000.00 | $35,000.00 | $5,000.00 |
| 67 | New Jersey | | $15,000.00 | $17,566.00 | $2,566.00 |
| 68 | Unknown | | $60,000.00 | $0.00 | -$60,000.00 |
| 69 | Unknown | | $20,000.00 | $24,000.00 | $4,000.00 |
| 70 | Unknown | | $35,000.00 | $0.00 | -$35,000.00 |
| | **Gross Loss:** | | $4,040,198.00 | $964,122.74 | |
| | **Net Loss:** | | $3,076,075.26 | | |

21. Additional examples of victims of defendant RANDY POULSONS's scheme include

Victim E, who informed law enforcement officers, in substance and in part, that Victim E met POULSON through the SJIC and attended seminars and "boot camps" on real estate investing hosted by POULSON. As a "perk" for investing with POULSON, Victim E was able to attend some of these seminars for free.

22. At one of the SJIC meetings, POULSON solicited Victim E for a private money investment. POULSON encouraged Victim E to place investment money into an IRA with Equity Trust and then invest money from the IRA with Equity Capital Investments so as to avoid paying taxes on any profit from his investment.

23. Victim E first invested with POULSON in or about March 2008. Defendant RANDY POULSON requested a $20,000 investment from Victim E for a two-year term, earning 15% interest. The $20,000 investment was to be used for closing costs and repairs on a specific, unidentified property. Victim E agreed and provided POULSON with a personal check for $20,000. In March 2009, Victim E lost Victim E's job and requested an earlier payback on the investment. POULSON provided a check to Victim E in the amount of $23,068 on or about March 31, 2009.

24. In or about March 2009, defendant RANDY POULSON approached Victim E about investing in three other properties. POULSON stated the investment term would be two years for each investment with a 15% return. POULSON stated he would provide Victim E with recorded mortgages to back his investments, and he further told Victim E that the properties would never be mortgaged over 70% of their market value. Finally, POULSON stated that the money would be used for POULSON to purchase the properties, pay for the closing costs, pay for any repairs to the property, and that POULSON was going to fix up and rent the properties.

25. Based on defendant RANDY POULSON's representations and the fact that Victim E had been repaid his previous investment, Victim E agreed to invest a total of $115,000 with POULSON in or about March 2009.

26. On or about March 15, 2009, Victim E emailed a representative at Equity Trust and requested that a total of $85,000 be released for two investments into two properties (one located on Quiet Road in Sicklerville, New Jersey, and one located on South Jackson Street in Woodbury, New Jersey) and attached two promissory notes and two mortgages received from defendant RANDY POULSON. On or about March 27, 2009 Victim E sent a similar email to Equity Trust, asking to release $30,000 for an investment in a property located on Friendship Court in Sicklerville, New Jersey, and attaching a mortgage and a promissory note for the property.

27. Equity Trust sent defendant RANDY POULSON three checks: one for $25,000 and one for $60,000 on or about March 17, 2009, and one for $30,000 on or about March 27, 2009, all via UPS, a private commercial carrier.

28. Bank records show that $85,000 was deposited into Equity Capital Investments' bank account number ending 4258 on or about March 18, 2009, $30,000 was deposited into Equity Capital Investments' bank account number ending 4258 on or about March 31, 2009, and all three checks were endorsed by defendant RANDY POULSON.

29. Other than partial mortgage payments, the investigation has failed to reveal any evidence that defendant RANDY POULSON used Victim E's investment for any of the authorized uses POULSON represented to Victim E, such as repairs on the properties, rehabilitation work, or closing costs. The investigation also revealed that POULSON never recorded the mortgages he provided to Victim E.

30. Furthermore, a review of Equity Capital Investments' bank records reveals several, subsequent, unauthorized business expenditures and personal expenditures, including but not limited to, The Goddard School (a daycare facility), personal credit card bills and defendant RANDY POULSON's home heating bill, and small repayments to other investors.

31. The investigation has also revealed that the properties had numerous, additional, recorded and unrecorded mortgages on them.[3]

    a. The property on Quiet Road has one recorded mortgage and one unrecorded mortgage on the property

    b. The property on South Jackson Street has two recorded mortgages and eight unrecorded mortgages on the property.

    c. The property on Friendship Court has three recorded mortgages and three unrecorded mortgages on the property.

---

[3] The FBI was able to determine that these other mortgages were unrecorded after receiving copies of the mortgages from other victims of POULSON's scheme, reviewing County records, and comparing the other victims' mortgages to the mortgages recorded by the County. The total number of unrecorded mortgages on each of these properties is unknown.